**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

CHAMBER OF COMMERCE OF THE
UNITED STATES; CALIFORNIA
CHAMBER OF COMMERCE;
EMPLOYERS GROUP; CALIFORNIA
HEALTHCARE ASSOCIATION;
CALIFORNIA MANUFACTURERS AND
TECHNOLOGY ASSN.; CALIFORNIA
ASSOCIATION OF HEALTH FACILITIES;
CALIFORNIA ASSOCIATION OF HOME
& SERVICES FOR THE AGING; BETTEC
CORPORATION; MARKSHERM
CORPORATION; ZILACO INC., ZILACO;
DEL RIO HEALTHCARE, INC.;
BEVERLY HEALTH & REHABILITATION
SERVICES, INC. dba Beverly Manor
Costa Mesa; INTERNEXT GROUP,
          *Plaintiffs-Appellees,*

CALIFORNIA LABOR FEDERATION,
AFL-CIO; AMERICAN
FEDERATION OF LABOR AND
CONGRESS OF INDUSTRIAL
ORGANIZATIONS,
          *Intervenors-Appellants,*

       v.

No. 03-55166

D.C. No.
CV-02-00377-GLT

BILL LOCKYER, Attorney General,
in his capacity as Attorney
General of the State of California;
DEPARTMENT OF HEALTH SERVICES;
FRANK G. VANACORE, as the Chief
of the Audit Review and Analysis
Section of the California
Department of Health Services;
DIANA M. BONTA, R.N., Dr., Ph.D,
as the Director of the California
Department of Health Services,
                    *Defendants.*

CHAMBER OF COMMERCE OF THE
UNITED STATES; CALIFORNIA
CHAMBER OF COMMERCE;
EMPLOYERS GROUP; CALIFORNIA
HEALTHCARE ASSOCIATION;
CALIFORNIA MANUFACTURERS AND
TECHNOLOGY ASSN.; CALIFORNIA
ASSOCIATION OF HEALTH FACILITIES;
CALIFORNIA ASSOCIATION OF HOME
& SERVICES FOR THE AGING; BETTEC
CORPORATION; MARKSHERM
CORPORATION; ZILACO INC., ZILACO;
DEL RIO HEALTHCARE, INC.;
BEVERLY HEALTH & REHABILITATION
SERVICES, INC. dba Beverly Manor
Costa Mesa; INTERNEXT GROUP,
                    *Plaintiffs-Appellees,*
            and

No. 03-55169
D.C. No.
CV-02-00377-GLT
OPINION

CALIFORNIA LABOR FEDERATION,
AFL-CIO; AMERICAN
FEDERATION OF LABOR AND
CONGRESS OF INDUSTRIAL
ORGANIZATIONS,
                    *Intervenors-Appellants,*

                    v.

BILL LOCKYER, Attorney General,
in his capacity as Attorney
General of the State of California;
DEPARTMENT OF HEALTH SERVICES;
FRANK G. VANACORE, as the Chief
of the Audit Review and Analysis
Section of the California
Department of Health Services;
DIANA M. BONTA, R.N., Dr., Ph.D,
as the Director of the California
Department of Health Services,
                    *Defendants-Appellants.*

Appeal from the United States District Court
for the Central District of California
Gary L. Taylor, District Judge, Presiding

Argued and Submitted
March 21, 2006—San Francisco, California

Filed September 21, 2006

Before: Mary M. Schroeder, Chief Judge, Stephen Reinhardt,
Robert R. Beezer, Alex Kozinski, Andrew J. Kleinfeld,
Michael Daly Hawkins, Sidney R. Thomas,
Barry G. Silverman, M. Margaret McKeown,
Kim McLane Wardlaw, Raymond C. Fisher,
Richard A. Paez, Johnnie B. Rawlinson, Richard R. Clifton
and Consuelo M. Callahan, Circuit Judges.

Opinion by Judge Fisher;
Dissent by Judge Beezer

**COUNSEL**

Bill Lockyer, Tom Greene, Richard T. Waldow, Angela Sierra (argued), Sacramento, California, for the defendants-appellants.

Stephen P. Berzon, Scott A. Kronland (argued), Stacey M. Leyton, Altshuler, Berzon, Nussbaum, Rubin & Demain, San Francisco, California, for the intervenors-appellants.

Bradley W. Kampas (argued), D. Gregory Valenza, Scott Oborne, Jackson Lewis LLP, San Francisco, California, for the plaintiffs-appellees.

John H. Ferguson, Division of Enforcement Litigation, Washington, DC, for *amicus curiae* National Labor Relations Board.

Daniel V. Yager, McGuiness Norris & Williams, LLP, Washington, DC, for *amici curiae* Associated Builders and Contractors, Inc. and LPA, Inc.

Fran M. Layton, Shute, Mihaly & Weinberger LLP, San Francisco, California, for *amicus curiae* South Coast Air Quality Management District.

## OPINION

FISHER, Circuit Judge:

The question before us is whether a state's exercise of its sovereign power to control the use of its funds conflicts with national labor policy as expressed in the National Labor Relations Act ("NLRA"), 29 U.S.C. §§ 151-169. Specifically, two provisions in a California statute forbid employers who receive state grant or program funds in excess of $10,000 from using those funds to assist, promote or deter union organizing. We hold that California's grant and program fund restrictions do not undermine federal labor policy, are not preempted by the NLRA and do not violate the First Amendment.

## FACTUAL BACKGROUND

On September 28, 2000, California enacted Assembly Bill No. 1889, Cal. Gov't Code §§ 16645-16649 (collectively, "AB 1889"). The preamble of the statute declares:

It is the policy of the state not to interfere with an employee's choice about whether to join or to be represented by a labor union. For this reason, the state should not subsidize efforts by an employer to assist, promote, or deter union organizing. It is the intent of the Legislature in enacting this act to prohibit an employer from using state funds and facilities for the purpose of influencing employees to support or oppose unionization and to prohibit an employer from seeking to influence employees to support or oppose unionization while those employees are performing work on a state contract.

§ 16645, Historical and Statutory Notes, Section 1 of Stats. 2000, c. 872.

Two provisions of the California statute, sections 16645.2 and 16645.7, are at issue in this appeal.[1] Section 16645.2(a) bars private employers who are "recipient[s] of a grant of state funds" from "us[ing] the funds to assist, promote, or deter union organizing." Section 16645.7(a) bars "[a] private employer receiving state funds in excess of [$10,000] in any calendar year on account of its participation in a state program" from using program funds "to assist, promote, or deter union organizing." The phrase "assist, promote, or deter union organizing" includes "any attempt by an employer to influence the decision of its employees in this state or those of its

---

[1]The parties stipulated to the district court's entry of a partial final judgment as to preemption of § 16645.2 and § 16645.7 to facilitate prompt appellate review of the district court's preemption ruling regarding these two sections only.

subcontractors regarding . . . [w]hether to support or oppose a labor organization that represents or seeks to represent those employees . . . . [or] [w]hether to become a member of any labor organization." § 16645(a)(1)-(2). The statute specifies as prohibited "any expense, including legal and consulting fees and salaries of supervisors and employees, incurred for research for, or preparation, planning, or coordination of, or carrying out, an activity to assist, promote, or deter union organizing." § 16646(a). Expressly exempted from the statute's reach are "activit[ies] performed" or "expense[s] incurred" in connection with "[a]ddressing a grievance or negotiating or administering a collective bargaining agreement" and "[n]egotiating, entering into, or carrying out a voluntary recognition agreement with a labor organization." § 16647(a), (d).

The statute requires employers covered by sections 16645.2 or 16645.7 to certify that no state funds will be used to assist, promote or deter union organizing. §§ 16645.2(c), 16645.7(b). It also requires employers who make expenditures to assist, promote or deter union organizing to maintain and provide upon request "records sufficient to show that state funds have not been used for those expenditures." §§ 16645.2(c), 16645.7(c).[2] If an employer commingles state and other funds,

---

[2]Despite the absence of any finding by the district court that § 16645.2(c) and § 16645.7(c) are onerous, the dissent insists that these provisions entail "burdensome and detailed record-keeping," impose "seemingly impossible compliance burdens" and are "daunting." (Dissent at 11815, 11816, 11817.) The dissent even suggests that these provisions require "an employer [to] create and maintain two completely separate accounting and payroll systems." (Dissent at 11817.) The statute, however, does not require "employers to maintain records in any particular form," § 16648, and leaves employers free to design their accounting and payroll systems however they wish, provided only that they have "records sufficient to show that state funds have not been used" to assist, promote or deter organizing. §§ 16645.2(c), 16645.7(c). Moreover, the only expert testimony in the record on these provisions states that they provide employers "flexibility in establishing proper accounting procedures and controls," impose no burden greater than numerous other common grant restrictions and in fact "appear to be significantly less burdensome than the detailed requirements for federal grant recipients . . . ."

the statute presumes that any expenditures to assist, promote or deter union organizing derive in part from state funds. § 16646(b).

Employers who violate sections 16645.2 or 16645.7 are subject to fines and penalties, which include the disgorgement of the state funds used for the prohibited purposes and a civil penalty paid to the state that is equal to twice the amount of those funds. §§ 16645.2(d), 16645.7(d). Suspected violators may be sued by the state Attorney General or by any private taxpayer. § 16645.8(a)-(c). Prevailing plaintiffs, and prevailing taxpayer intervenors who make substantial contributions to an action under this section, are "entitled to recover reasonable attorney's fees and costs."[3] § 16645.8(d).

In April 2002, plaintiffs-appellees (collectively, the "Chamber of Commerce") brought an action for injunctive and declaratory relief challenging the statute facially on numerous grounds, including NLRA preemption. The AFL-CIO and others (collectively, the "AFL-CIO") intervened. In May 2002, the Chamber of Commerce moved for summary judgment. Defendants, who are the California Department of Health Services and state officials sued in their official capacity (collectively, "California"), filed cross motions for summary judgment in August 2002.

On September 16, 2002, the district court granted partial summary judgment in favor of the Chamber of Commerce. The district court determined that the NLRA preempted sec-

---

[3]The dissent finds it significant that the statute allows private taxpayers to sue suspected violators. (Dissent at 11815-16.) In this respect, the statute is no different from any number of other federal and state laws or qui tam causes that enable private attorneys general to help detect, punish and deter wrongdoing. In contrast to some such statutes (e.g., § 4 of the Clayton Act, 15 U.S.C. § 15), which encourage private suits by permitting plaintiffs to be awarded treble damages, AB 1889 only allows private litigants to recover attorney's fees and costs — the damages go to the state. *See* § 16645.8(d).

tions 16645.2 and 16645.7 under the Supreme Court's *Machinists* doctrine because the provisions "regulate[d] employer speech about union organizing under specified circumstances, even though Congress intended free debate." *Chamber of Commerce v. Lockyer*, 225 F. Supp. 2d 1199, 1205 (C.D. Cal. 2002); *see Lodge 76, Int'l Ass'n of Machinists v. Wisc. Employment Relations Comm'n*, 427 U.S. 132 (1976). The district court entered judgment in January 2003 and issued an injunction prohibiting California and the AFL-CIO from taking any actions to enforce sections 16645.2 and 16645.7 against any employer subject to the NLRA. California and the AFL-CIO appealed.

A three-judge panel of our court affirmed the district court, but the panel then withdrew its opinion upon the grant of appellants' petition for panel rehearing. *Chamber of Commerce v. Lockyer*, 364 F.3d 1154 (9th Cir. 2004), *withdrawn and reh'g granted*, 408 F.3d 590 (9th Cir. 2005). On rehearing, a divided panel issued a second opinion, *Chamber of Commerce v. Lockyer*, 422 F.3d 973 (9th Cir. 2005), which was in turn vacated and withdrawn from publication for reconsideration en banc. *See Chamber of Commerce v. Lockyer*, 435 F.3d 999 (9th Cir. 2006); *Chamber of Commerce v. Lockyer*, 437 F.3d 890 (9th Cir. 2006). We now reverse the district court's judgment that the NLRA preempts the California statute and vacate the court's injunctive order.

## STANDARD OF REVIEW

We review de novo a district court's grant of summary judgment and preemption analysis. *See Winterrowd v. Am. Gen. Annuity Ins. Co.*, 321 F.3d 933, 937 (9th Cir. 2003); *Ting v. AT&T*, 319 F.3d 1126, 1135 (9th Cir. 2003). "A facial challenge to a legislative Act is . . . the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid." *Rust v. Sullivan*, 500 U.S. 173, 183 (1991) (internal quotation marks and citation omitted).

## DISCUSSION

### I.  Market Participant Exception

**[1]** Before addressing the merits of the preemption issue, we must first decide whether California's condition on the use of its funds constitutes "regulation." "A prerequisite to preemption [under the NLRA] is a finding that the state or local action in question constitutes *regulation* of labor relations between employers and employees." *Alameda Newspapers, Inc. v. City of Oakland*, 95 F.3d 1406, 1413 (9th Cir. 1996). The NLRA "does not preempt actions taken by a state when it . . . acts as a mere proprietor or market participant." *Dillingham Constr. N.A., Inc. v. County of Sonoma*, 190 F.3d 1034, 1037 (9th Cir. 1999) (citing *Bldg. & Constr. Trades Council of the Metro. Dist. v. Associated Builders & Contractors of Mass./R.I., Inc.*, 507 U.S. 218, 227 (1993) ("*Boston Harbor*")). We conclude that California has acted as a regulator in enacting sections 16645.2 and 16645.7, and that the market participant exception does not apply.

Two Supreme Court cases define the scope of the market participant exception: *Wisconsin Department of Industry v. Gould Inc.*, 475 U.S. 282 (1986), and *Boston Harbor*, 507 U.S. at 218.[4] In *Gould*, the Court addressed a Wisconsin statute that forbade state procurement agents from using state funds to purchase products manufactured or sold by "labor law violators," i.e., employers who had violated the NLRA three times within a five-year period. 475 U.S. at 283-84. Wisconsin conceded that it did not have the power to "bar its

---

[4]Our discussion here is limited to the context of the market participant exception under the NLRA. A market participant exception exists in a number of other contexts, such as cases under the Commerce Clause. *See, e.g.*, *Big Country Foods, Inc. v. Bd. of Educ. of Anchorage*, 952 F.2d 1173, 1177-79 (9th Cir. 1992) (discussing market participant exception in the dormant Commerce Clause context). We do not opine on the applicability of our reasoning to the market participant exception in these other contexts.

residents from doing business with repeat violators of the NLRA." *Id.* at 287. It argued, however, that its statutory scheme was not unlawful because the statute merely regulated the spending power of its procurement officers. *Id.* The Court found this to be a "distinction without a difference" because the Wisconsin statute "serve[d] plainly as a means of enforcing the NLRA." *Id.* Wisconsin "concede[d], as [the Court thought] it must, that the point of [its] statute is to deter labor law violations and to reward fidelity to the law." *Id.* (internal quotation marks omitted). The Court emphasized the "rigid and undiscriminating manner in which the statute operate[d]," and concluded that "[n]o other purpose could credibly be ascribed" to the statute than creating an additional remedy for violations of the NLRA. *Id.* at 287.

In *Boston Harbor*, on the other hand, the Court held that the Massachusetts Water Resources Authority, a state agency, acted as a market participant when it required contractors working on the cleanup of Boston Harbor to agree to the terms of a project labor agreement negotiated by a project construction manager and a labor union. 507 U.S. at 232. The Court concluded that there was "no question but that [the state agency] was attempting to ensure an efficient project that would be completed as quickly and effectively as possible at the lowest cost." *Id.* The Court also noted that "the challenged action in this litigation was specifically tailored to one particular job, the Boston Harbor cleanup project," and that there was no reason to believe that the government was motivated by anything other than purely proprietary interests. *Id.*

We have applied these cases in a number of contexts without formulating a general rule about when the market participant exception applies. We have held that the market participant exception did not apply to a California law that permitted employees in state-approved apprenticeship programs to receive less than the prevailing wage, but required employees in non-approved apprenticeship programs to receive the prevailing wage. *Dillingham*, 190 F.3d at 1037-38

(noting that the apprenticeship standards were not "based upon unique needs that the . . . project presented" and that the state was not motivated by "management concerns" in implementing the standards). On the other hand, we have applied the exception and held that the City of Oakland was a market participant when it canceled a newspaper subscription and refused to continue to pay for advertising during a labor dispute. *Alameda Newspapers*, 95 F.3d at 1415-16. And we have held that a city may require private contractors to adhere to the terms of a collective bargaining agreement when doing business with the city. *Associated Builders & Contractors, Inc. v. City of Seward*, 966 F.2d 492, 496 (9th Cir. 1992).[5]

**[2]** These cases teach that when a state uses its spending power in a manner that is essentially not proprietary, the market participant exception will not apply and the state action may be subject to NLRA preemption. We draw upon the reasoning of the Fifth Circuit, which asks two discrete questions to determine when the market participant exception applies:

> First, does the challenged action essentially reflect the entity's own interest in its efficient procurement of needed goods and services, as measured by comparison with the typical behavior of private parties in similar circumstances? Second, does the narrow scope of the challenged action defeat an inference

---

[5]*City of Seward*, which was decided before *Boston Harbor*, creates some confusion about the relation of the market participant exception to other NLRA preemption doctrines. *City of Seward* concluded that "action taken by the state as a market participant is not automatically immune from NLRA preemption." 966 F.2d at 495. *Boston Harbor*, however, held explicitly that the "[NLRA] preemption doctrines apply only to state *regulation*," and that "a State may act without offending the pre-emption principles of the NLRA when it acts as a proprietor." 507 U.S. at 227, 229-30. *Boston Harbor*, therefore, makes clear that once a state's action falls within the "market participant" exception, it is not preempted under the NLRA. To the extent that *City of Seward* states otherwise, we hold it overruled.

that its primary goal was to encourage a general pol-
icy rather than address a specific proprietary prob-
lem? Both questions seek to isolate a class of
government interactions with the market that are so
narrowly focused, and so in keeping with the ordi-
nary behavior of private parties, that a regulatory
impulse can be safely ruled out.

*Cardinal Towing & Auto Repair, Inc. v. City of Bedford*, 180
F.3d 686, 693 (5th Cir. 1999).

**[3]** The first question, which looks to the nature of the
expenditure, protects comprehensive state policies with wide
application from preemption, so long as the type of state
action is essentially proprietary. *See, e.g.*, *N. Ill. Chapter of
Associated Builders & Contractors, Inc. v. Lavin*, 431 F.3d
1004, 1007 (7th Cir. 2005) (state law requiring recipients of
state grants for the construction of renewable-fuel plants to
enter into a project labor agreement was not preempted, where
the condition was limited to the project financed by the state
grant); *Bldg. & Constr. Trades Dep't, AFL-CIO v. Allbaugh*,
295 F.3d 28, 34-36 (D.C. Cir. 2002) (executive order applying
to all federally funded construction projects was not pre-
empted, where the order concerned a project labor agreement
that private employers often enter into in the construction
field). The second question, which looks at the scope of the
expenditure, protects narrow spending decisions that do not
necessarily reflect a state's interest in the efficient procure-
ment of goods or services, but that also lack the effect of
broader social regulation. *See, e.g.*, *Alameda Newspapers*, 95
F.3d at 1417-18. Each question constitutes a separate method
of determining whether the state action at issue actually con-
stitutes regulation, and a state need not satisfy both questions
to be deemed to act as a market participant.

**[4]** Here, we conclude that sections 16645.2 and 16645.7
are regulatory and are not protected by the market participant
exception. The statute on its face does not purport to reflect

California's interest in the efficient procurement of goods and services, as measured by the similar behavior of private parties. Rather, the statute's preamble makes clear that the legislation's purpose is to prevent "state funds and facilities" from being used to subsidize an employer's attempt to influence employee choice about whether to join a union. *See* § 16645, Historical and Statutory Notes, Section 1 of Stats. 2000, c. 872 ("It is the policy of the state not to interfere with an employee's choice about whether to join or to be represented by a labor union. For this reason, the state should not subsidize efforts by an employer to assist, promote, or deter union organizing.").

**[5]** Nor do sections 16645.2 and 16645.7 have a narrow scope or other element indicating that the statute is unrelated to broader regulation. To the contrary, the statute by design sweeps broadly, applying to all employers in California who accept any state grant or program funds in excess of $10,000. §§ 16645.2, 16645.7. It requires any business that accepts state grant or program funds in excess of $10,000 to maintain records sufficient to show that these funds were not used to assist, promote or deter organizing. *Id.* It contains a provision for civil penalties and permits private parties to file civil actions against employers who violate the statute. § 16645.8. The statute's scope indicates a general state position of neutrality with regard to organizing, not a narrow attempt to achieve a specific procurement goal. These considerations counsel that sections 16645.2 and 16645.7 are regulatory measures that fall outside the market participant exception.[6]

---

[6]This case is thus distinct from *Alameda Newspapers*, where we concluded that a city's proclamation of support in favor of a labor union in an ongoing strike at a local newspaper, and the city's decision to refrain from purchasing advertisements and to cancel its subscriptions as a result of the strike, did not constitute regulation subject to NLRA preemption. 95 F.3d at 1409. There, we emphasized the merely exhortatory nature of the proclamation, noting that "[t]he resolution ha[d] no binding force on anyone." *Id.* at 1414. We also concluded that the city's cancellation of subscriptions and refusal to advertise did not "have some 'real effect' or practical economic impact on the employer that [wa]s either different from that of the ordinary customer or . . . otherwise governmental in nature." *Id.* at 1416.

## II.   NLRA Preemption

**[6]** That sections 16645.2 and 16645.7 are regulatory does not mean that they are also preempted by the NLRA. "We are reluctant to infer pre-emption," *Boston Harbor*, 507 U.S. at 224, and any analysis of preemption begins with the "basic assumption that Congress did not intend to displace state law." *Maryland v. Louisiana*, 451 U.S. 725, 746 (1981). Preemption is a question of congressional intent, and the " 'purpose of Congress is the ultimate touchstone' of preemption analysis." *Alameda Newspapers*, 95 F.3d at 1413 (quoting *Malone v. White Motor Corp.*, 435 U.S. 497, 504 (1978)). Although the NLRA contains no express preemption provision, the Supreme Court has articulated two distinct NLRA preemption doctrines: *Machinists* preemption, set forth in *Lodge 76, International Ass'n of Machinists v. Wisconsin Employment Relations Commission*, 427 U.S. 132 (1976), and *Garmon* preemption, set forth in *San Diego Building Trades Council v. Garmon*, 359 U.S. 236 (1959). We hold that sections 16645.2 and 16645.7 are not preempted under either *Machinists* or *Garmon*.

### A.   Machinists *Preemption*

**[7]** *Machinists* preemption operates as a form of labor field preemption. It requires the preemption of any state regulation of activity that, although not directly regulated by the NLRA, was intended by Congress "to be controlled by the free play of economic forces," *Machinists*, 427 U.S. at 140 (internal quotation marks and citation omitted), in a "zone free from all regulations, whether state or federal." *Boston Harbor*, 507 U.S. at 226. The doctrine "is based on the premise that 'the use of economic pressure by the parties to a labor dispute is . . . part and parcel of the process of collective bargaining,' " which means that "neither a state nor the National Labor Relations Board is 'afforded flexibility in picking and choosing which economic devices of labor and management shall be branded unlawful.' " *Alameda Newspapers*, 95 F.3d at

1413 (quoting *Machinists*, 427 U.S. at 144, 149). "*Machinists* pre-emption preserves Congress' intentional balance between the uncontrolled power of management and labor to further their respective interests" in an area free from regulation. *Boston Harbor*, 507 U.S. at 226 (internal quotation marks and citation omitted).

[8] Federal courts of appeals have applied *Machinists* pre-emption in the context of collective bargaining between organized labor and employers, not in the context of organizing, which is the subject of AB 1889.[7] *Machinists* itself dealt with a collective bargaining dispute in which union members refused to accept overtime assignments during labor contract renewal negotiations. The Supreme Court held that "state attempts to influence the substantive terms of collective-bargaining agreements are as inconsistent with the federal regulatory scheme as are such attempts by the NLRB," and that "federal labor policy and the federal Act have pre-empted state regulatory authority to police the use by employees and employers of peaceful methods of putting economic pressure upon one another." 427 U.S. at 153, 154. In *Golden State Transit Corp. v. City of Los Angeles*, 493 U.S. 103, 110-11 (1989), the Court stated that "[i]n *Machinists*, we reiterated that Congress intended to give parties to a collective-bargaining agreement the right to make use of 'economic weapons,' not explicitly set forth in the Act, free of governmental interference."[8] And in *Metropolitan Life Insurance Co.*

---

[7]The dissent contends that *Machinists* preempts AB 1889 because the California statute "specifically targets and substantially affects the NLRA *bargaining process*." (Dissent at 11822 (emphasis added).) But AB 1889 applies only to organizing, not collective bargaining.

[8]In the Court's 1989 *Golden State Transit Corp.* decision, it held that the taxi company was entitled to maintain a § 1983 action against Los Angeles for the city's violation of the company's right (as stated in the Court's 1986 decision, *Golden State Transit Corp. v. City of Los Angeles*, 475 U.S. 608 (1986) ("*Golden State I*")), to be free from interference with its choice and use of economic weapons in the collective bargaining process. In *Golden State I*, the Court had held that the city's refusal to renew the taxi company's franchise because the company's employees were on strike was preempted under *Machinists*.

*v. Massachusetts*, where a state statute mandating minimum healthcare benefits was held not to be preempted, the Court explained:

> [*Machinists*] cases rely on the understanding that in providing in the NLRA a framework for self-organization and collective bargaining, Congress determined both how much the conduct of unions and employers should be regulated, and how much it should be left unregulated: The States have no more authority than the Board to upset the balance that Congress has struck between labor and management in the collective-bargaining relationship. For a state to impinge on the area of labor combat designed to be free is quite as much an obstruction of federal policy as if the state were to declare picketing free for purposes or by methods which the federal Act prohibits. All parties correctly understand this case to involve *Machinists* pre-emption.

471 U.S. 724, 751 (1985) (internal quotation marks and citation omitted).

We have also held that "*Machinists* preemption prohibits states from imposing restrictions on labor and management's 'weapon[s] of self-help' that were left unregulated in the NLRA because Congress intended for tactical bargaining decisions and conduct 'to be controlled by the free play of economic forces.' " *Associated Builders & Contractors of S. Cal. v. Nunn*, 356 F.3d 979, 987 (9th Cir. 2004) (alteration in original) (quoting *Machinists*, 427 U.S. at 140, 146); *see also St. Thomas-St. John Hotel & Tourism Ass'n., Inc. v. Gov't of U.S.V.I. ex rel. V.I. Dep't of Labor*, 357 F.3d 297, 302 n.4 (3d Cir. 2004) ("Machinists preemption is a form of conflict preemption under which state regulation of the bargaining conduct of private parties is displaced because it conflicts with the purpose of Congress in enacting the NLRA to leave that conduct to be controlled by the free play of economic forces."

(internal quotation marks and citation omitted)); *McNealy v. Caterpillar, Inc.*, 139 F.3d 1113, 1117 n.1 (7th Cir. 1998) ("The Machinists doctrine similarly preempts state regulation of the economic weapons that Congress intended to leave available to unions and employers."); *Glenwood Bridge, Inc. v. City of Minneapolis*, 940 F.2d 367, 370-71 (8th Cir. 1991) (invoking *Machinists* preemption in a "state's intrusion into the bargaining process" between organized labor and an employer); *Derrico v. Sheehan Emergency Hosp.*, 844 F.2d 22, 29 (2d Cir. 1988) ("Our analysis of the [*Machinists*] preemption issues similarly accords with the principle that the parties' intent must govern the duration of their collectively bargained agreements."). Insofar as all these cases concern collective bargaining, they suggest that *Machinists*' principal and native application is limited to that sphere of activity, where Congress enacted an "intentional balance between the uncontrolled power of management" and organized labor to advance their respective interests in negotiating the terms and conditions of employment. *Boston Harbor*, 507 U.S. at 226 (internal quotation marks and citation omitted). Correspondingly, these cases strongly suggest that the *Machinists* doctrine is not likely to apply to organizing, a conclusion that the Chamber of Commerce conceded during oral argument when it acknowledged that interference with organizing is "typically" analyzed under the *Garmon* doctrine.[9]

We need not resolve whether *Machinists* extends to preempting a state action that potentially affects organizing, because even if it did, AB 1889 would not be preempted

---

[9]Secondary sources also discuss *Machinists* in the context of collective bargaining, not organizing. *See, e.g.*, N. Peter Lareau, 2 *Labor and Employment Law* 36.11-36.17 (2005); Robert A. Gorman, *Labor Law* 1103-10 (2004); Patrick Hardin et al., 2 *The Developing Labor Law* 2192-99 (2002); Robert Rachal, Machinists *Preemption Under the NLRA: A Powerful Tool to Protect an Employer's Freedom to Bargain*, 58 La. L. Rev. 1065, 1065 (1998) ("To protect the collective bargaining process from [attempts by government to alter collective bargaining], the Supreme Court developed *Machinists* preemption.").

under the *Machinists* doctrine. In enacting a restriction on the use of state grant and program funds with the purpose of remaining neutral in labor disputes, California has not intruded on conduct meant to be left to the free play of economic forces, an area free from all governmental regulation. Indeed, it is implausible that Congress intended the use of such funds to be an area "unregulated because left to be controlled by the free play of economic forces," *Machinists*, 427 U.S. at 140 (internal quotation marks omitted), when the state's choices of how to spend its funds are by definition not controlled by the free play of economic forces. *See Boston Harbor*, 507 U.S. at 225-26.

[9] In any event, AB 1889's restrictions on the use of grant and program funds do not interfere with an employer's ability to engage in "self-help" in the sense protected by *Machinists*. Unlike in *Gould* and *Golden State I*, the state has not engaged in a naked attempt to use its spending power to "introduce some standard of properly balanced bargaining power" or to alter employers' private spending decisions. *Machinists*, 427 U.S. at 149-50 (internal quotation marks and citation omitted). In restricting the *use* of state funds, California has not made employer neutrality or the substantive terms of employment between employer and employee a condition for the *receipt* of state funds. Under AB 1889, an employer has and retains the freedom to spend its own funds however it wishes; it simply may not spend state grant and program funds on its union-related advocacy. In contrast, had California enacted a statute that required neutrality as a condition of receiving state funds, the employer's use of its own funds would thereby have been curtailed. *See infra* pp. 11800-03.

The National Labor Relations Board ("NLRB"), which filed an *amicus curiae* brief in support of the Chamber of Commerce, nonetheless urges that *Machinists* does preempt the California statute. It cites *Alto Plastics Manufacturing Corp.*, 136 N.L.R.B. 850, 851 (1962), for the proposition that in a representation election, "employees may select a 'good'

labor organization, a 'bad' labor organization, or no labor organization, it being presupposed that employees will intelligently exercise their right to select their bargaining representative." The NLRB contends that AB 1889 works at cross purposes with such a policy because it limits the flow of information to employees by regulating employer speech in an area — an organization election — that Congress *did* intend to be controlled by the free play of economic forces.

We disagree with the way in which the NLRB characterizes AB 1889 and invokes *Machinists*. As explained above, the California statute does not prevent an employer from using non-state funds to assist, promote or deter organizing; it only restricts a recipient's use of state grant and program funds (in excess of $10,000) for that purpose. Consequently, the California statute does not impede the flow of information to employees by regulating employers' speech. Employers remain free to convey their views regarding unionization, and thus to exercise their First Amendment rights, provided only that they do not use state grant and program funds to do so.[10] For example, even if an employer made a business decision to fund its operations entirely through the receipt of state grants, such that the statute effectively prevented that employer from spending any portion of its revenues to advocate during an organization election, that effect would be incidental and solely the consequence of the employer's free-market choice. Nothing prevents the employer from raising additional funds from a non-state source and using those funds for advocacy purposes. It is well established that a legislature may attach "reasonable and unambiguous" conditions to funds that a recipient is not obligated to accept. *Rumsfeld*

---

[10]The statute's effect is therefore indirect and incidental, not unlike the Massachusetts law upheld in *Metropolitan Life*. *See* 471 U.S. at 755 ("Minimum state labor standards . . . neither encourage nor discourage the collective-bargaining processes that are the subject of the NLRA. Nor do they have any but the most indirect effect on the right of self-organization established in the Act.").

*v. Forum for Academic & Institutional Rights, Inc.*, 126 S. Ct. 1297, 1306 (2006) (internal quotation marks omitted); *see also Lavin*, 431 F.3d at 1006 (citing *Rust*, 500 U.S. at 173; *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569 (1998); *Buckley v. Valeo*, 424 U.S. 1 (1976)). We "cannot declare preempted all local regulation that touches or concerns in any way the complex interrelationships between employees, employers, and unions; obviously, much of this is left to the States." *Metro. Life*, 471 U.S. at 757 (internal quotation marks omitted).

More fundamentally, the NLRB is simply incorrect to suggest that *Machinists* preempts the California statute. As the NLRB acknowledges elsewhere in its brief, *Machinists* applies *solely* to zones of activity left free from *all* regulation. *See Boston Harbor*, 507 U.S. at 226. The NLRB's own extensive regulation of organizing activities demonstrates that *organizing* — and employer speech in the context of organizing — is not such a zone. *See, e.g.*, *Peoria Plastic Co.*, 117 N.L.R.B. 545, 547-48 (1957) (NLRB barring interviews with employees in their homes immediately before an election); *Peerless Plywood Co.*, 107 N.L.R.B. 427, 429 (1953) (NLRB barring employers and unions alike from making election speeches on company time to massed assemblies of employees within 24 hours of an election). *See also NLRB v. A.J. Tower Co.*, 329 U.S. 324, 330 (1946) ("Congress has entrusted the Board with a wide degree of discretion in establishing the procedure and safeguards necessary to insure the fair and free choice of bargaining representatives by employees.").[11] Indeed, section 9 of the NLRA affirmatively grants

---

[11]Like the NLRB, the dissent undermines its own argument when it cites Board decisions as examples of the NLRB's regulation of the organizing process. (Dissent at 11820.) *Machinists* applies only to zones free from all regulation, and the NLRB decisions show that organizing is not such a zone. "A state law that both explicitly targets and directly regulates processes controlled by the NLRA" might be preempted under *Garmon*, *see infra* p. 11791, but is surely not preempted "under the *Machinists* doctrine." (Dissent at 11820.)

the NLRB power to regulate employer and union conduct, including speech, that is prejudicial to a fair election. 29 U.S.C. § 159. In *Linn v. United Plant Guard Workers of Am., Local 114*, 383 U.S. 53, 60 (1966), the Supreme Court observed that the NLRB can set aside an election where a material fact has been misrepresented in the representation campaign, opportunity for a reply was lacking and the misrepresentation had an effect on the free choice of voting employees. The Court likewise noted that in a number of cases, the NLRB had even determined that use of "epithets such as 'scab,' 'unfair,' and 'liar,' " though not so indefensible as to remove them from the protection of section 7, could lead the NLRB to set aside an election if such epithets had "been uttered with actual malice, a deliberate intention to falsify or a malevolent desire to injure." *Id.* at 60-61 (citing *Bettcher Mfg. Corp.*, 76 N.L.R.B. 526 (1948); *Atl. Towing Co.*, 75 N.L.R.B. 1169, 1170-73 (1948) (internal quotation marks omitted)). *See also Midland Nat'l Life Ins. Co.*, 263 N.L.R.B. 127, 133 (1982) ("[W]e will set an election aside not because of the substance of the representation, but because of the deceptive manner in which it was made . . . .").

Significantly, the spending restrictions challenged by the Chamber of Commerce and NLRB are modeled precisely on those that Congress has enacted when prohibiting the use of federal funds to assist, promote or deter organizing. *See, e.g.*, Workforce Investment Act, 29 U.S.C. § 2931(b)(7) ("Each recipient of funds . . . shall provide to the Secretary assurances that none of such funds will be used to assist, promote, or deter union organizing."); National and Community Service State Grant Program, 42 U.S.C. § 12634(b)(1) ("Assistance provided under this title shall not be used by program participants and program staff to . . . assist, promote, or deter union organizing."); Head Start Programs Act, 42 U.S.C. § 9839(e) ("Funds appropriated to carry out this subchapter shall not be used to assist, promote, or deter union organizing."); *see also* Medicare Act, 42 U.S.C. § 1395x(v)(1)(N) ("In determining such reasonable costs,

costs incurred for activities directly related to influencing employees respecting unionization may not be included."). These restrictions are inconsistent with a congressional belief that union organizing involves "conduct . . . intended to be unregulated." *Golden State Transit Corp.*, 475 U.S. at 614 (internal quotation marks omitted). Instead, because an area left to the free play of economic forces is a "zone free from *all* regulations, *whether state or federal*," *Boston Harbor*, 507 U.S. at 226 (emphasis added), the federal restrictions are compelling evidence that the analogous conditions in AB 1889 do not intrude in a regulation-free area of labor relations and thus, contrary to the dissent's suggestion, do not "operate to frustrate the purpose" of the NLRA. (Dissent at 11821, quoting *Local 20, Teamsters v. Morton*, 377 U.S. 252, 258 (1964).) "The fact that Congress itself has . . . imposed the same type of restriction . . . as [a state] seeks to impose . . . is surely evidence that Congress does not view such a restriction as incompatible with its labor policies." *De Veau v. Braisted*, 363 U.S. 144, 156 (1960) (plurality opinion).[12]

[10] In sum, the mechanism California has employed to preserve its neutrality in labor disputes does not affect an employer's ability to use its own funds in connection with union organizing activities; nor do such activities constitute an area Congress intended to be free from all regulation. Accordingly, AB 1889 is not preempted under *Machinists*.

---

[12]The Supreme Court engaged in similar reasoning in *Metropolitan Life*, 471 U.S. at 754-55. There, the Court held that no incompatibility existed between national labor policy expressed in federal rules designed to restore the equality of bargaining power and state legislation that imposed minimal substantive requirements (in the form of healthcare benefits) on contract terms negotiated between parties to labor agreements. The Court reached this conclusion by noting, among other things, that it made no sense to infer that Congress intended the NLRA to deprive states of the ability to take such action when Congress itself passed similar federal laws applying to unionized employers and employees.

B.  Garmon *Preemption*

**[11]** *Garmon* preemption arises when there is an actual or potential conflict between state regulation and federal labor law due to state regulation of activity that is actually or arguably protected or prohibited by the NLRA. "When it is clear or may fairly be assumed that the activities which a State purports to regulate are protected by § 7 of the National Labor Relations Act, or constitute an unfair labor practice under § 8, due regard for the federal enactment requires that state jurisdiction must yield." *Garmon*, 359 U.S. at 244. Nonetheless,

> [w]hile the *Garmon* formulation accurately reflects the basic federal concern with potential state interference with national labor policy, the history of the labor pre-emption doctrine . . . does not support an approach which sweeps away state-court jurisdiction over conduct traditionally subject to state regulation without careful consideration of the relative impact of such a jurisdictional bar on the various interests affected.

*Sears, Roebuck & Co. v. San Diego County Dist. Council of Carpenters*, 436 U.S. 180, 188 (1978).

1.  *Actually protected or prohibited*

**[12]** Section 7 of the NLRA is entitled "Right of employees as to organization, collective bargaining, etc." 29 U.S.C. § 157. It identifies areas of protected employee conduct and can be fairly characterized as setting forth those employee practices that are actually protected by the NLRA. Section 8, conversely, is entitled "Unfair labor practices." 29 U.S.C. § 158. By its plain terms, it sets forth activities that are actually prohibited by the NLRA. It is easy to see how both section 7 and section 8 can be implicated in a *Garmon* preemption analysis: if a state regulates employee activities that are actually protected under section 7, or activities of

either employers or labor unions that are actually prohibited under section 8, that regulation will be preempted unless it falls within an exception to *Garmon*. *See* 359 U.S. at 243-44.

**[13]** Section 8(c) prohibits sanctioning employers under the NLRA for engaging in an unfair labor practice when they exercise speech rights that are guaranteed by the First Amendment.[13] This subsection can be termed the "free speech exemption" to section 8's delineation of unfair labor practices, because it carves out noncoercive speech from the category of actually punishable activity. Notwithstanding the dissent's mistaken insistence to the contrary, section 8(c) does not *grant* employers speech rights. (Dissent at 11824.) Rather, it simply prohibits their noncoercive speech from being used as evidence of an unfair labor practice. *See, e.g.*, *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 617 (1969) (stating that section 8(c) "merely implements the First Amendment"); *Hotel Employees, Local 2 v. Marriott Corp.*, 961 F.2d 1464, 1470 n.9 (9th Cir. 1992) ("[S]ection 8(c) merely states an employer does not commit an unfair labor practice by expressing its views regarding unionization."); *UAW-Labor Employment & Training Corp. v. Chao*, 325 F.3d 360, 364-65 (D.C. Cir. 2003) ("Fitting a *Garmon* claim under the language of § 8(c) is awkward. . . . [T]he activities described in § 8(c) . . . are not 'protected *by*' the NLRA, except from the NLRA itself."); *see also Fiber Indus., Inc.*, 267 N.L.R.B. 840, 841 (1983) ("[I]t is well settled that Sec. 8(c) applies only to unfair labor practice proceedings.").

The Chamber of Commerce and dissent argue, however, that to say an activity is not punishable by the NLRA is to

---

[13]Entitled "Expression of views without threat of reprisal or force or promise of benefit," § 8(c) provides that "[t]he expressing of any views, argument, or opinion, or the dissemination thereof, whether in written, printed, graphic, or visual form, shall not constitute or be evidence of an unfair labor practice under any of the provisions of this Act, if such expression contains no threat of reprisal or force or promise of benefit." 29 U.S.C. § 158(c).

protect that activity. Because AB 1889's restrictions on grant and program funds purportedly affect an employer's ability to speak against unionization, the Chamber of Commerce and dissent urge, the statute improperly intrudes on the employer's implied (yet somehow actually explicit in section 8(c)) NLRA speech right — as distinct from its separate First Amendment rights — and is therefore preempted under *Garmon*.

We reject this peculiar proposition. The Chamber of Commerce and dissent cite no authority to support it, and the NLRB itself makes no such claim as to section 8(c)'s supposed affirmative grant of speech rights. *See NLRB Amicus Brief* at 4, 21-26 (echoing interpretation of NLRA in cases quoted above, and noting section 8(c)'s "exemption" for noncoercive speech). Rather, some activities in labor relations are neither protected nor prohibited by the NRLA and are therefore not preempted under *Garmon. See, e.g.*, *NLRB v. Ins. Agents' Int'l Union*, 361 U.S. 477, 492-95 & n.23 (1960) (finding unpersuasive the argument that because certain union activities were unprotected under section 7, those activities should also be deemed unfair labor practices under section 8, and stating that "[t]here is little logic in assuming that because Congress was willing to allow employers to use self-help against union tactics, if they were willing to face the economic consequences of its use, it also impliedly declared these tactics unlawful as a matter of federal law").[14] If this were not the case, *Machinists* preemption would cease to exist, for *Machinists* addresses "activity that [i]s neither arguably protected against employer interference by §§ 7 and 8(a)(1) of the NLRA, nor arguably prohibited as an unfair

---

[14]*See also UAW-Labor Employment & Training Corp.*, 325 F.3d at 363-64 ("The dissent makes a similar error when it suggests that the order is preempted because it conflicts with the 'regulatory scheme' the Board has established. This would be a sound analysis under 'field' preemption, but *Garmon* works differently, operating only as to activities arguably protected or prohibited, *not* to ones simply left alone, even if left alone deliberately." (internal citations omitted)).

labor practice by § 8(b) of that Act." *Metropolitan Life*, 471 U.S. at 749.

**[14]** California's refusal to subsidize employer speech for or against unionization does not regulate an activity that is actually protected or actually prohibited by the NLRA. It does not interfere with, much less govern, "the same partisan employer speech that Congress committed to the jurisdiction of the NLRB." (Dissent at 11825.) Nor does it infringe employers' First Amendment rights, because employers remain free to use their own funds to advocate for or against unionization and are not required to accept neutrality as a condition for receipt of state grant and program funds. *See infra* pp. 11800-02; *see also Regan v. Taxation with Representation*, 461 U.S. 540, 549 (1983) ("We have held in several contexts that a legislature's decision not to subsidize the exercise of a fundamental right does not infringe the right."); *Rust*, 500 U.S. at 193, 200; *Cammarano v. United States*, 358 U.S. 498, 513 (1959).

### 2. *Arguably protected or prohibited*

**[15]** In *Sears*, the Supreme Court refined its *Garmon* preemption doctrine in the context of an employer's common law trespass suit against picketing union members where the picketing was "arguably — but not definitely — prohibited or protected by federal law." 436 U.S. at 182. *Sears* divided the inquiry into two related but distinct questions: whether the state court's jurisdiction over the trespassing claim was preempted (1) by the arguably prohibited nature of the picketing, or (2) by its arguably protected nature.[15]

---

[15]The dissent argues that we err in considering whether AB 1889 is preempted by interfering unduly with an arguably protected or prohibited activity because, in the dissent's idiosyncratic and incorrect view, the real cause of *Garmon* preemption is AB 1889's alleged interference with actually protected conduct — the speech rights purportedly granted under § 8(c). (Dissent at 11828.) Insofar as the dissent suggests we apply *Sears*

As to whether the union's picketing was arguably prohib-
ited by the NLRA, *Sears* articulated a relatively straightfor-
ward "primary jurisdiction" test: if the claim considered by
the state tribunal is identical to one that could be presented to
the NLRB, the state's jurisdiction is preempted. *Id.* at 197,
201; *see also Belknap, Inc. v. Hale*, 463 U.S. 491, 511-12
(1983) (applying primary jurisdiction test to state regulation
of arguably prohibited conduct). As to whether the picketing
was arguably protected by the NLRA, the Court went beyond
the primary jurisdiction test to address additional federal
supremacy concerns: chiefly, whether preemption was war-
ranted — despite the lack of identity between issues the state
court and NLRB might consider — to protect against the "risk
of misinterpretation of [the NLRA] and the consequent prohi-
bition of protected conduct." *Sears*, 436 U.S. at 203. We
employed this "primary jurisdiction plus" approach in *Rad-
cliffe v. Rainbow Construction Co.*, 254 F.3d 772, 786 (9th
Cir. 2001), where we held that state jurisdiction over claims
by union members against an employer for false arrest, false
imprisonment and malicious prosecution were not preempted
under *Garmon*.[16]

---

to avoid addressing whether AB 1889 is preempted by interfering with an
actually protected activity (Dissent at 11826), its claim ignores our express
repudiation of that argument in Section II.B.1 *supra*. To the extent the dis-
sent contends we err in even analyzing whether AB 1889 interferes with
arguably protected or prohibited conduct (*id.* at 11826, 11828), it neglects
the Chamber of Commerce's own contention that the statute does so, and
fails to recognize that such analysis is orthodox in *Garmon* analysis. *See,
e.g.*, *Local 926, Int'l Union of Operating Eng'rs v. Jones*, 460 U.S. 669,
676 (1983) ("Our approach to the pre-emption issue has thus been stated
and restated. First, we determine whether the conduct that the State seeks
to regulate or to make the basis of liability is actually *or arguably* pro-
tected or prohibited by the NLRA. Although the *Garmon* guidelines [are
not to be applied] in a literal, mechanical fashion, if the conduct at issue
is *arguably* prohibited or protected otherwise applicable state law and pro-
cedures are ordinarily pre-empted." (internal quotation marks and citations
omitted) (alteration in original) (emphasis added)).

[16]In *Radcliffe*, defendants argued that "the validity of the plaintiffs'
claims . . . turns on whether the union activities carried on by the plaintiffs
were . . . protected by § 7 of the NLRA." 254 F.3d at 785.

Here, the parties do not dispute that the NLRB has no interest in resolving the central controversy that a state court would have to resolve in enforcing AB 1889, namely, whether state funds were used to "assist, promote, or deter union organizing." Far from being the same as a question the NLRB might consider, a suit under the California statute would entail accounting only for the employer's possible use of state funds.

The Chamber of Commerce, however, argues that a state court enforcing AB 1889 would in some instances need to determine whether a union was a "labor organization" under section 16647, an area that it claims is reserved to the NLRB under *Marine Engineers Beneficial Ass'n v. Interlake S.S. Co.*, 370 U.S. 173, 178 (1962). But even if the state court had to make such a determination, it would be relevant only to the ultimate question of whether an employer spent state grant or program funds to assist, promote or deter organizing, not to whether the employer's advocacy violated the NLRA. We have previously rejected an argument that the incidental determination by a state court of whether persons were engaged "in lawful union activity" was sufficient to occasion *Garmon* preemption, where the focus of the state proceeding was on "state concerns of accommodating such union activity with the state-law rights of private property." *Radcliffe*, 254 F.3d at 786. Moreover, AB 1889 is not comparable to the Minnesota statute at issue in *Marine Engineers*, under which a state law determination that certain groups were not labor organizations permitted the state court to regulate picketing and other activities identical to those that could have been raised before the NLRB. *Marine Eng'rs*, 370 U.S. at 176.

The Chamber of Commerce also argues that because AB 1889 restricts an employer's ability to use state funds to "influence" its employees, *see* § 16645(a), California courts would effectively be deciding whether employers had improperly acted under section 8(a) of the NLRA to "restrain[ ] or coerce employees in the exercise of the rights guaranteed in

[section 7 of the NLRA]." 29 U.S.C. § 158(a)(1) (NLRA § 8(a)). However, were the NLRB to consider an unfair labor practice charge arising from the employer's conduct, it would focus on whether the employer had interfered with the employees' section 7 rights, regardless of whether the employer used state funds in the process. In contrast, under AB 1889, the California court would determine only whether an employer used state grant or program funds to influence employees, not whether that attempt violated the NLRA. Because the statute focuses solely on the *use* of state funds, there is no identity of claims, and the primary jurisdiction test is not met.[17]

We next assess whether the state statute is preempted because Congress would "prefer[ ] the costs inherent in a jurisdictional hiatus to the frustration of national labor policy which might accompany the exercise of state jurisdiction." *Sears*, 436 U.S. at 203. For essentially the same reasons explained in the primary jurisdiction analysis, there is no risk that a state court applying AB 1889 could "misinterpret[ ] . . . federal law." *Id.* Not only is there no identity of claims, but the subject matter of an AB 1889 suit is so far removed from the NLRA's primary focus — the determination of what constitutes an unfair labor practice — that any rationale for *Garmon* preemption is absent.

*Sears* itself is instructive. In that case, after noting the state interest in hearing trespass claims, the Court identified a clear potential overlap between the NLRB's jurisdiction and that of the state court.

[T]he state court was obligated to decide [whether]

---

[17]There is no merit to the Chamber of Commerce's claim that the California statute provides an additional remedy for NLRA violations. The statute's damages provisions are intended to remedy the misuse of state funds under the statute, regardless of whether any NLRA violation has occurred.

> the trespass was not actually protected by federal law, a determination which might entail an accommodation of Sears' property rights and the Union's § 7 rights. In an unfair labor practice proceeding initiated by the Union, the Board might have been required to make the same accommodation.

*Id.* at 201. The Court further stated that the trespass at issue was arguably protected by the NLRA, whereas previously recognized exceptions to *Garmon* preemption did not "involve[ ] protected conduct." *Id.* at 204. Nevertheless, the Court held that the risk that a state's regulation of trespass might impermissibly trench upon the NLRB's jurisdiction over the speech rights of union members was too unlikely to justify usurpation of the state's prerogative. There was no "significant risk of prohibition of protected conduct," so the Court was "unwilling to presume that Congress intended the arguably protected character of the [regulated] conduct to deprive the California courts of jurisdiction to entertain Sears' trespass action." *Id.* at 207.

[16] In contrast to *Sears*, there is no potential overlap between the NLRB's jurisdiction and that of a state court hearing a suit brought under AB 1889. However, even if there were some risk of overlap, California has as important and legitimate a sovereign interest in determining how the recipients of state grant and program funds use those funds as it does in entertaining trespass actions. Thus, even if AB 1889 had some peripheral and incidental effect on the arguably protected advocacy rights of employers, given the nature and mechanics of the statute (which has no concern for whether the speech at issue is protected by the NLRA, but focuses only on the source of the money funding the speech), there is no "significant risk of prohibition of protected conduct." *Id.* California's interest is so strong that we cannot "presume that Congress intended the arguably protected character of the [regulated] conduct to deprive" the state of the ability to control the use of its fisc in this modest manner. *Id.*

The Supreme Court has cautioned that "inflexible application of [the *Garmon*] doctrine is to be avoided, especially where the State has a substantial interest in regulation of the conduct at issue and the State's interest is one that does not threaten undue interference with the federal regulatory scheme." *Farmer v. United Bhd. of Carpenters*, 430 U.S. 290, 302 (1977). Our "balanced inquiry into such factors as the nature of the federal and state interests in regulation and the potential for interference with federal regulation," *id.* at 300, ensures that we avoid preempting state regulation of conduct that involves "interests so deeply rooted in local feeling and responsibility that, in the absence of compelling congressional direction, we [cannot] infer that Congress ha[s] deprived the States of the power to act," or where "the activity regulated [is] a merely peripheral concern" of the NLRA. *Garmon*, 359 U.S. at 243-44; *see also Belknap*, 463 U.S. at 498. The previously recognized exceptions to *Garmon* preemption have involved exercises of state court jurisdiction over universally recognized common law torts, rather than, as here, the limited exercise of a state's spending power. *See, e.g.*, *Linn*, 383 U.S. at 62 ("[A] State's concern with redressing malicious libel is 'so deeply rooted in local feeling and responsibility' " that it is not preempted despite arguably overlapping NLRB jurisdiction over the speech at issue.) (quoting *Garmon*, 359 U.S. at 244). But the logic that compelled the Supreme Court to recognize the exception for certain torts applies just as powerfully, if not more so, to a state's effort to ensure that those who accept its grant and program funds use them for the purpose for which they were given.[18]

---

[18]For instance, suppose California granted money to hospitals to create more nurse positions and did not want the effectiveness of its grants diminished by funding a campaign to convince nurses not to unionize. So long as the hospitals remained free to lobby nurses with their own monies, California would be well within its rights to insist that its grants be used for the purpose for which they were given — the creation of needed nursing positions.

In this sense, a state's control of its purse strings is of at least as great a concern to the state as its power to regulate defamatory speech, violence, trespass, obstruction of access to property or the intentional infliction of emotional distress.[19] Just as the state has a responsibility to protect its citizenry from such torts, so it has a responsibility and a right to spend its treasure — largely generated from the pockets of its citizens — based on principles and guidelines that its democratically elected legislature deems to be appropriate. Such spending decisions are, of course, subject to federal supremacy concerns. But the Supreme Court has commanded us to be extremely cautious before concluding that a federal regulatory scheme intrudes upon so fundamental a state prerogative. "Whatever risk of an erroneous state-court adjudication does exist is outweighed by the anomalous consequence of a rule" that would deny the state the ability to control its fisc in the circumstances presented here. *Sears*, 436 U.S. at 206. In an era of tight budgets, where many important and competing interests vie for every dollar of a state's treasury, it is all the more important that states retain their right to control the allocation of their scarce resources. Thus, even if AB 1889's restriction on the use of state grant and program funds intruded on an activity arguably protected or arguably prohibited by the NLRA — and we hold that it does not — *Garmon*'s recognized exception would save the California statute from preemption. *See Garmon,* 359 U.S. at 243-44.

## III.   First Amendment

[17] Although we elsewhere discuss why AB 1889 does not infringe the First Amendment rights of grant and program fund recipients, *see supra* pp. 11786-88, 11794, we elaborate on our reasoning here in response to the dissent's contention

---

[19]*See Linn*, 383 U.S. at 63-64; *Youngdahl v. Rainfair, Inc.*, 355 U.S. 131, 139-40 (1957); *Sears*, 436 U.S. at 207; *Int'l Union, United Auto. Workers of America (UAW-CIO) v. Russell*, 356 U.S. 634, 644-46 (1958); *Farmer*, 430 U.S. at 302-06.

to the contrary based largely on its erroneous premise that AB 1889 compels "employers themselves to take a position of neutrality with respect to labor relations." (Dissent at 11809.) As we explained in Section II.A., *supra* p. 11786, the California statute does not impose any condition on the *receipt* of state grant and program funds. Because an employer retains the freedom to raise and spend its own funds however it wishes — so long as it does not *use* state grant and program funds on union-related advocacy — AB 1889 does not infringe employers' First Amendment right to express whatever view they wish on organizing.[20]

Accordingly, AB 1889's effect on speech is properly considered in light of *Rust v. Sullivan*, 500 U.S. 173 (1991). In *Rust*, the Court held that "[b]y requiring that the . . . grantee engage in abortion-related activity separately from activity receiving federal funding, Congress has . . . not denied it the right to engage in abortion-related activities." *Id.* at 198. In short, a restriction on the use of government funds for an activity does not compel cessation of the activity.

[18] Here, California has not "denied" employers the "right to engage in [union]-related activity," but has "merely refused to fund such activities out of the public fisc." *Id.* This conclusion follows from the Court's familiar observation about what is regulation and what is not. "[A] legislature's decision not to subsidize the exercise of a . . . right does not infringe the right." *Regan*, 461 U.S. at 546, 549 (rejecting the "notion that First Amendment rights are somehow not fully realized unless they are subsidized by the State"); *see also Lyng v. Int'l Union, UAW*, 485 U.S. 360, 368-69 (1988). The legislature

---

[20]For instance, California agreed during oral argument that nothing in AB 1889 prevents a closed corporation that receives 100% of its revenues from the state from using its *own* funds to assist, promote or deter organizing, where the corporation receives those funds as a capital contribution by a shareholder who reinvested a legitimately distributed corporate dividend — itself the fruit of the receipt of state grant or program funds.

can "insist[ ] that public funds be spent for the purposes for which they [a]re authorized," even if doing so forbids the use of government funds for other speech. *Rust*, 500 U.S. at 196; *see also United States v. Am. Library Ass'n*, 539 U.S. 194, 212 (2003). California, in enacting AB 1889, has simply availed itself of that prerogative.[21]

Nor is there any merit to the dissent's assertion that AB 1889 violates employers' First Amendment Rights by "irrevocably stamp[ing] dollar bills with 'Property of California' " and "limit[ing] the items an employer may purchase with these specific dollar bills." (Dissent at 11809.) The dissent's parade of horribles goes far beyond the scope of plaintiffs' facial challenge to sections 16645.2 and 16645.7 and the record before us. The district court made no findings, nor is there evidence, that AB 1889 "co-opts the payment for goods and services and profit realized under a contract." (Dissent at 11808.)[22] Consistent with *Rust*, the California statute, like var-

---

[21]The dissent questions the legitimacy of AB 1889 because the statute was "sponsored by the California Labor Federation, AFL-CIO, and supported by a phalanx of labor unions." (Dissent at 11816.) Not only is this an irrelevant consideration, but it also is not up to us as judges to impugn the California legislature's motives. As the Seventh Circuit wisely observed in *Lavin*:

> If (as seems likely) Illinois has taken the approach in this law because state officials want to assist organized labor as well as the farmers who supply the grain to be made into ethanol and the owners of ethanol plants, that is neither a surprise nor a reason for invalidity. Most legislation is the product of coalitions among interest groups. Boston wanted to clean up its harbor, but there can be little doubt that it also wanted to shower benefits on workers who were the incumbents' political supporters. . . . *Federal preemption doctrine evaluates what legislation does, not why legislators voted for it or what political coalition led to its enactment.* This statute does not affect people who spurn the state's largesse.

431 F.3d at 1007 (emphasis added).

[22]As noted previously, *supra* note 1, the only issue before us is whether AB 1889's grant and program fund restrictions, § 16645.2 and § 16645.7,

ious federal acts, requires only that those who accept government grant and program funds use them for the purpose for which they were given. Our construction of AB 1889 is "readily apparent," *Gooding v. Wilson*, 405 U.S. 518, 521 (1972) (internal quotation marks and citation omitted), but even were it not, the statute is not "overly broad and unconstitutional" (Dissent at 11812) because its restrictions on the use of grant and program funds have been "carefully drawn" to mirror the mechanics of constitutionally sound federal acts. *Gooding*, 405 U.S. at 522; *see also Regan*, 461 U.S. at 549-50.

It is even more implausible that AB 1889's restrictions on grant and program funds "alter [the funds'] use as legal tender" and frustrate the "basic tenets of our economic system." (Dissent at 11809, 11811) Again, the statute's text is precisely modeled on language the Congress itself has used. The Workforce Investment Act, for example, regulates federal funds given to state boards to be awarded as "*grants or contracts*, on a competitive basis, to eligible providers within the State or outlying area to enable the eligible providers to develop, implement, and improve adult education or literacy activities within the State." 20 U.S.C. § 9241(a) (emphasis added). The Workforce Investment Act also requires "[e]ach recipient of funds . . . [to] provide . . . assurances that none of such funds will be used to assist, promote, or deter union organizing." 29 U.S.C. § 2931(b)(7). AB 1889's exactly analogous requirement can hardly be antithetical to the monetary concept of free tender.[23]

---

are preempted by the NLRA or are constitutionally invalid. The statute's restriction on the use of *contract* funds, § 16645.4, is not at issue nor was it addressed by the district court, and the dissent errs in implying otherwise. (Dissent at 11808-12.)

[23]The dissent also disregards the nature of state programs, which are run to serve public purposes and need not guarantee a profit to private companies. (Dissent at 11811.) For instance, in the MediCal program, which the Chamber of Commerce itself discusses in the context of nursing homes that are "entirely dependent on state funds," state funding is designed only to cover the costs of services performed. Notably, allowable costs under

## CONCLUSION

Because sections 16645.2 and 16645.7 of AB 1889 are not preempted under either *Machinists* or *Garmon* and do not on their face infringe plaintiffs' First Amendment rights, the judgment of the district court is **REVERSED** and its injunction is **VACATED**. We remand for further proceedings consistent with this opinion.

---

MediCal are also based on federal Medicare cost reporting standards, which provide that "[i]n determining such reasonable costs, costs incurred for *activities directly related to influencing employees respecting unionization may not be included*." 42 U.S.C. § 1395x(v)(1)(N) (emphasis added).

BEEZER, Circuit Judge, with whom KLEINFELD and CAL-LAHAN, Circuit Judges, join in dissent:

May a state leverage its spending power to induce an employer to adopt a neutral policy toward labor union organizing? The First Amendment, the National Labor Relations Act ("NLRA" or "the Act"), and well-established doctrines of preemption, demand an answer in the negative.

By extending the definition of "state funds" to include any monies received by a private employer as a result of contracting with the state, AB 1889 strikes at the heart of the First Amendment. AB 1889 prohibits not just the use of state money granted to an employer for and under a specific program but also co-opts the payment for goods and services and profit realized under a contract (undoubtedly not state funds). AB 1889's gag rules prevent any employer from spending its own funds in direct violation of the First Amendment.

The NLRA extends to employees the opportunity to render a free and informed choice about union representation. In doing so, the Act allows for robust debate of union representation issues by employers and employees alike. California Assembly Bill 1889, codified at Cal. Govt. Code §§ 16645-49, ("AB 1889" or "the statute"), stifles employers from fully participating in organizing and exercising the rights that are explicitly granted to them by Congress under the NLRA. The statute rides roughshod over the delicate balance established by Congress between labor unions and employers. In addition, the California statute interferes with the NLRA's extension of exclusive jurisdiction to the National Labor Relations Board ("NLRB") for the adoption and enforcement of representation

election rules. I would hold the federal preemption of the relevant provisions of the California statute to be complete.

I

AB 1889 is far from a neutral enactment that simply restricts use of undefined "state funds." It abrogates the First Amendment rights of employers to speak out and discuss union organizing campaigns. Under the guise of preserving state neutrality, the statute operates to impel employers themselves to take a position of neutrality with respect to labor relations, in direct conflict with employers' rights under the First Amendment.

AB 1889 applies to any vendor of goods or services who receives payouts from the State of California "in excess of ten thousand dollars in any calendar year on account of its participation in a state program." "State program" is not defined in the statute and this broad language brings under the auspices of the statute every purveyor of goods or services unlucky enough to cross the magic $10,000 threshold in its annual contracting with the state.[1] AB 1889's speech regulations and presumption that "state funds" have been spent on union-related expenditures allows the state to irrevocably stamp dollar bills with "Property of California," alter their use as legal tender and limit the items an employer may purchase with those specific dollar bills. All this, despite the fact that the employer has fully performed under a contract and the state has received every item it is entitled to under the terms of the contract. AB 1889 writes a neutrality provision into every

---

[1]The term contracting may suggest a more narrow application than that intended by AB 1889. AB 1889, as written, takes a programmatic approach to controlling the labor-managment arena through its extensive reach to all businesses who have a financial involvement in state regulated activities. For example, hospitals or nursing homes that accept Medi-Cal patients (a state program) are likely to receive over $10,000 in payments from California. The acceptance of these state payments subjects those payments and that vendor to the strictures of AB 1889.

contract the state enters into without requiring the state to bargain or pay for such a pricey concession. The statute also fails to state where an employer may turn to recover any compliance costs that a labor organization may recover in a suit authorized by the Act — another unbargained for benefit gained by the state.

A statutory blanket prohibition on employers advocating for or against unions would blatantly violate the First Amendment as the state has no legitimate interest in prohibiting employers from speaking on union issues. Even the opinion of the court recognizes that the statute only passes constitutional muster if it is read to only apply to state funds. Opinion of the Court at 11794 ("Nor does it interfere with employers' exercise of their First Amendment rights, because employers remain free to use their own funds to advocate for or against unionization and are not required to accept neutrality as a condition for receipt of state funds."). Just because the majority closes it eyes and wishes it were so cannot alter the economic fact that AB 1889 both explicitly and implicitly does unconstitutionally require neutrality as a condition for contracting with the state. A state could not terminate a contract due to the contractor's speech, nor could it decide not to contract based on the employer's speech as either decision would violate the employer's First Amendment Rights. *Board of County Comm'rs v. Wabaunsee County, Kansas*, 518 U.S. 668 (1996) (Government cannot retaliate against independent contractors for exercising First Amendment Rights).

Once the state has chosen to award a contract to the lowest responsible bidder, the state's interest in the funds it pays for the contracted goods and services is at end. It has made a bargain for the provision of a limited set of benefits and the vendor has agreed to provide those goods and services, including labor, in exchange for money. Once the exchange has been made and payment has been received, that money can no longer be considered "state funds." The state has no interest in how those funds are spent by the vendor and the state has no

right or reason to limit an individual who engages in a labor dispute from using its own money for any lawful purpose. Upon payment to the employer those funds became free tender and any attempt by the state to undermine the buying power of free tender by limiting the types of goods that can be purchased with funds in which the state is not vested with a residual interest is fundamentally opposed to the basic tenants of our economic system and the First Amendment.

Every reasonable employer will also have built into its contract a measure of profit. This profit is the earned compensation of the employer upon completion of its contractual duties. AB 1889 seeks to condition the uses to which an employer may put these specific funds. The problems with this profit-taking are most stark when considering the case of employers who conduct all of their business with the state. These employers can offer their employees bonuses, pay for all-inclusive vacations to Tahiti, throw extravagant parties with champagne and caviar, or simply bank their profits to save for a rainy day. What they cannot do, according to AB 1889, is hold a mandatory meeting to discuss unionization (either the benefits or burdens) with their employees. Employers who receive all of their revenue from the state have no other option but to cease all union-related speech. The opinion of the court has no mercy for these employers as it concludes that they have made their own bed through their "free-market choice." Simply because a business or individual chooses to contract with the state, or even accept employment from the state, does not mean that the state may abrogate First Amendment rights. *See, e.g. United States v. National Treasury Employees Union*, 513 U.S. 454 (1995). Free market choice or not, these employers retain their First Amendment right to spend their own funds, as they undoubtedly earn by contracting with the state, as they see fit.

Because AB 1889 commandeers private employers own funds, in addition to regulating the use of state funds, I would

hold that the statute is overly broad and unconstitutional under the First Amendment.

## II

The NLRA is a comprehensive scheme designed to balance the rights and interests of both employers and employees and provides an administrative mechanism to resolve questions concerning union representation. Recognizing the extreme importance of the free flow of information, the NLRA explicitly protects rights of employers to express their views on union organizing efforts. The opinion of the court recognizes the importance of unrestricted speech and the free flow of information to the proper enactment of the Act but blithely and naively concludes that the California statute does not impede the flow of information to employees by regulating employers' speech. It ignores the application of AB 1889 to employers own funds, the intensely burdensome and one-sided regulatory scheme and the actual impact of the statute as amply demonstrated in the record.

## A.

Congress' intent to protect the free-flow of information between employers and employees is embodied in Section 8(c) of the Act, which permits employers to articulate, in a non-coercive manner, their views regarding union organizing efforts:

> The expressing of any views, argument, or opinion, or the dissemination thereof, whether in written, printed, graphic, or visual form, shall not constitute or be evidence of an unfair labor practice under any of the provisions of this subchapter, if such expression contains no threat of reprisal or force or promise of benefit.

29 U.S.C. § 158(c). Congress added Section 8(c) of the NLRA in 1947, "to insure both to employers and labor orga-

nizations full freedom to express their views to employees on labor matters . . . ." S. Rep. 80-105, at 23 (1947). Indeed, the explicit purpose of Section 8(c) was "to protect the right of free speech when what the employer says or writes is not of a threatening nature or does not promise a prohibited favorable discrimination." H.R. Rep. No. 80-510 (1947), *reprinted in* 1947 U.S. Code Cong. Serv. 1135, 1151.

The United States Supreme Court recognizes that "the enactment of § 8(c) manifests a congressional intent to encourage free debate on issues dividing labor and management." *Linn v. United Plant Guard Workers, Local 114*, 383 U.S. 53, 62 (1966). The Court also holds that "an employer's free speech right to communicate his views to his employees is firmly established and cannot be infringed by a union or the Board." *NLRB v. Gissel Packing Co.,* 395 U.S. 575, 617 (1969). The Congressional enactment of Secion 8(c), the Court explains, in conjunction with the First Amendment, allows employers to express "any of [their] general views about unionism or any of [their] specific views about a particular union" in a non-coercive manner. *Id.* at 618.

Our case law has also consistently emphasized the importance of an employer's freedom of speech in labor relations matters. "Freedom of speech is an essential component of the labor-management relationship. Collective bargaining will not work, nor will labor disputes be susceptible to resolution, unless both labor and management are able to exercise their right to engage in 'uninhibited, robust, and wide-open' debate." *Steam Press Holdings v. Haw. Teamsters & Allied Workers Union, Local 996,* 302 F.3d 998, 1009 (9th Cir. 2002) (quoting *New York Times v. Sullivan,* 376 U.S. 254, 270 (1964)). For a concise and accurate statement of the rule, we adopted the principle of free speech in union representation matters as crafted by the Fifth Circuit:

> The guaranty of freedom of speech and assembly to the employer and to the union goes to the heart of

> the contest over whether an employee wishes to join a union. It is the employee who is to make the choice and a free flow of information, the good and the bad, informs him as to the choices available.

*NLRB v. TRW-Semiconductors, Inc.,* 385 F.2d 753, 760 (9th Cir. 1967) (quoting *Southwire Co. v. NLRB,* 383 F.2d 235, 241 (5th Cir. 1967)).

Our opinions have faithfully reiterated a "commit[ment] to the principle that debate in union campaigns should be vigorous and uninhibited," so long as the debate is free of coercion and retaliatory threats. *NLRB v. Lenkurt Elec. Co.,* 438 F.2d 1102, 1108 (citing *NLRB v. TRW-Semiconductors, Inc.,* 385 F.2d 753, 759-60 (9th Cir. 1967)). "The exercise of free speech in these campaigns should not be unduly restricted by narrow construction. It is highly desirable that the employees involved in a union campaign should hear all sides of the question in order that they may exercise the informed and reasoned choice that is their right." *Id.; accord, Montgomery Ward & Co. v. NLRB,* 385 F.2d 760, 763 (8th Cir. 1967) ("[T]he right of free speech guaranteed by the First Amendment and § 8(c) of the Act should not be defeated by narrow or strained construction.").

This protection of the speech of both employees and employers is the heart of Congress' design to protect and enhance union organizing. The NLRB supports this congressional policy of free speech, holding "that it will not restrict the right of any party to inform employees of the advantages and disadvantages of unions and of joining them as long as such information is imparted to employees in a noncoercive manner." *Trent Tube Co.,* 147 NLRB 538, 541 (1964) (internal quotation marks omitted); *see also United Technologies Corp.,* 274 NLRB 1069, 1074 (1985) ("[A]n employer has a fundamental right, protected by Section 8(c) of the Act, to communicate with its employees concerning its position in

collective-bargaining negotiations and the course of those negotiations." (footnote omitted)).

## B.

AB 1889 prohibits grantees and private employers from using funds received from the state "to assist, promote, or deter union organizing," which is defined to include "any attempt by an employer to influence the decision of its employees in this state or those of its subcontractors regarding . . . [w]hether to support or oppose a labor organization . . . or [w]hether to become a member of any labor organization." Cal. Gov't Code §§ 16645(a), 16645.2(a), 16645.7(a). The prohibited expenditures include the payments by an employer for legal and consulting fees relating to union organizing efforts as well as the salaries of supervisors and employees related in any respect to union organizing efforts. § 16646. The statute exempts several types of pro-union activities and expenses from the prohibition, including "[a]ddressing a grievance or negotiating or administering a collective bargaining agreement" and "[n]egotiating, entering into, or carrying out a voluntary recognition agreement with a labor organization." §§ 16647(a), (d).

The statute entails burdensome and detailed record-keeping. The statute requires that employers and grantees certify in advance that the state funds will not be used for speech and activities that are related to union organizing. §§ 16645.2(c), 16645.7(b). In addition, employers and grantees must maintain detailed records showing that none of the funds have been used for speech regarding labor relations. §§ 16645.2(c), 16645.7(c). Those records must be made available to the Attorney General upon request. *Id.* The statute presumes that, where funds are commingled, state funds were used to assist, promote, or deter union organizing. § 16646(b).

The enforcement provisions place heavy burdens on affected employers. The statute renders employers and grant-

ees liable for treble damages (i.e., the amount of state funds that were expended in violation of the statute, plus a civil penalty equal to twice the amount of those funds). §§ 16445.2(d), 16445.7(d). The Attorney General of California, or any private taxpayer, may file a lawsuit against a suspected violator "for injunctive relief, damages, civil penalties, and other appropriate equitable relief." § 16645.8(a). The statute awards a prevailing plaintiff, or certain prevailing taxpayer intervenors, attorney's fees and costs. § 16645.8(d). The statute does not award any attorney's fees or costs to a prevailing employer. By creating seemingly impossible compliance burdens, by means of onerous accounting requirements and the threat of lawsuits, the statute essentially mandates employer neutrality. The statute effectively halts employer campaigns to defeat labor organizing activity or even an employer's ability to offer an opinion on the merits of one union versus another. Similar to neutrality agreements, which are often sought by unions from employers, the California statute pushes employers to a policy of neutrality, which in turn helps facilitate union organizing. It is no surprise that the California statute was sponsored by the California Labor Federation, AFL-CIO, and supported by a phalanx of labor unions. Sen. Comm. on Industrial Relations, Comm. Rep. for 1999 Cal. Assemb. B. No. 1889, 1999-00 Reg. Sess., at 1 (June 28, 2000). Equally telling, a law firm which represented itself as "the largest Union-side labor law firm on the West Coast" wrote in a letter to the California Attorney General that AB 1889, if not halted by a court, would "have a significant positive effect on various [union] organization drives . . . ."

The statute carries a false air of evenhandedness. It purports to limit employers from using state funds to either "promote" union organizing or "deter" union organizing. §§ 16645.2(a), 16645.7(a). What must be understood, of course, is that few, if any, employers will wish for their employees to vote for union representation. Rare, indeed, will the circumstance be where an employer will actually dedicate resources to encourage its employees to unionize. The California Teamsters

revealed the true impact of the legislation in a letter to certain members of the California legislature when AB 1889 was under consideration. The California Teamsters Public Affairs Council "urged [an] 'aye' vote on AB 1889" because it "prohibit[s] employers who receive state funds from using those funds to *discourage* unionization" and will affect the "all too common practice" of "employer campaigns to defeat labor organizing activity." (emphasis added).

The compliance provisions are daunting. Employers must maintain records demonstrating a complete separation of state funds. These records must identify every expense at all related to a union organizing campaign, save for a few pro-union exceptions, and prove conclusively that such expenses do not derive from state funds. §§ 16645.2(c), 16445.7(c), 16646, 16647. The statute creates a presumption that the employer used state funds for unionization purposes unless proven otherwise. § 16646(b). This presumption applies even when an employer has sufficient private funds such that no state funds were actually expended. *Id.* The statute's documentation demands, which require employers to track every moment of employee time and every expense that somehow relates to deterring union organizing efforts, operate to inhibit employers from opposing union representation drives at all.

To comply with the statute and continue to oppose unionization or speak out on the merits of one union versus another, an employer must create and maintain two completely separate accounting and payroll systems. This becomes necessary because the California statute requires the employer to monitor public and private funds and ensure that the statute's mandate of fund separation is fulfilled. In addition, the statute requires the employer to engage in the virtually impossible task of allocating every single employer expense related to union organizing activity, including supervisor time and employee time, which must be meticulously logged and tracked.

The record before us shows that labor unions have leveraged the significant compliance burdens of the statute to enhance their bargaining position as against employers. After AB 1889 passed, unions began writing to the California Attorney General's office, alleging violations of the statute in an effort to coerce employers to abstain from distributing literature, retaining consultants and legal counsel, or otherwise communicating with employees about the advantages and disadvantages of employment in a union shop. One union wrote the Attorney General and alleged that an employer violated the statute because employees who were attending a mandatory meeting about union organizing were not paid with a separate paycheck for time that each employee spent at the meeting. Another union alleged a violation of the statute, with little factual support, but offered to "settle" the alleged violation if the employer agreed to enter into a neutrality agreement with the union. Yet another union alleged that an employer violated AB 1889 by hiring an attorney to represent it during an organizing drive without arranging to pay for these legal services from funds that were conclusively derived from a source other than the state. The attempts by the AFL-CIO, in briefs filed in this appeal, to downplay the decidedly pro-union impact of AB 1889 are belied by the record before the court. What that record teaches is that the unions' have and will aggressively use AB 1889 to gain a special advantage in labor disputes and thereby alter the balance of power between unions and employers.

In light of these burdens and this record it cannot be said with a straight face that the statute "does not affect an employer's ability to use its own funds in connection with union organizing activity." Opinion of the Court at 11790. The significant and undeniable impact AB 1889 has on employers' speech rights means that not only does it violate the First Amendment, but it is undoubtedly preempted by the NLRA.

III

The Supreme Court's preemption doctrines as they relate to the NLRA have long been centered around reinforcing the "purpose of the Act[, which] was to obtain 'uniform application' of its substantive rules and to avoid the 'diversities and conflicts likely to result from a variety of local procedures and attitudes toward labor controversies.' " *NLRB v. Nash-Finch Co.,* 404 U.S. 138, 144 (1971) (quoting *Garner v. Teamsters Union,* 346 U.S. 485, 490 (1953)). The Court has articulated "two distinct NLRA pre-emption principles" as expressed in *San Diego Building Trades Council v. Garmon,* 359 U.S. 236 (1959) ("*Garmon* preemption"), and *Machinists v. Wisconsin Employment Relations Commission,* 427 U.S. 132 (1976) ("*Machinists* preemption"). *Metropolitan Life Ins. Co. v. Massachusetts,* 471 U.S. 724, 748, 748-49 (1985).

I would hold that the preemption doctrines established in *Garmon* and *Machinists* completely preempt the relevant provisions of the California statute.

A.

The doctrine of "*Machinists* pre-emption preserves Congress' intentional balance between the uncontrolled power of management and labor to further their respective interests." *Bldg. & Trades Council v. Associated Builders ("Boston Harbor"),* 507 U.S. 218, 226 (1993) (internal quotation marks omitted). Although cast nominally as an effort to ensure state neutrality, the California statute, by stifling speech rights of employers and their ability to participate in a debate about the value of unions generally or advise employees as to which union is preferable, operates to significantly empower labor unions as against employers. In doing so, the statute destroys the delicate balance between labor unions and employers as mandated by Congress through the NLRA. For this initial reason, AB 1889 is preempted by the NLRA, pursuant to

*Machinists v. Wisconsin Employment Relations Commission,* 427 U.S. 132 (1976).

*Machinists* preemption "is based on the premise that 'the use of economic pressure by the parties to a labor dispute is . . . part and parcel of the process of collective bargaining,' " which means that "neither a state nor the National Labor Relations Board is 'afforded flexibility in picking and choosing which economic devices of labor and management shall be branded unlawful.' " *Alameda Newspapers, Inc. v. City of Oakland,* 95 F.3d 1406, 1413 (9th Cir. 1996) (quoting *Machinists,* 427 U.S. at 144, 149).

Under the doctrine of *Machinists* preemption, a state cannot "deny[ ] one party . . . a weapon that Congress meant him to have available," because such a state regulation "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Machinists,* 427 U.S. at 150, 151 (internal quotation marks omitted). Employers have a number of tools at their disposal in exercising their Section 8(c) rights to express their views on union organizing efforts. An employer is permitted, for example, to express its views about union representation to masses of employees, in mandatory meetings, on company time, so long as such speech does not occur within 24 hours of an election. *See Peerless Plywood Co.,* 107 NLRB 427, 429 (1953); *Livingston Shirt Corp.,* 107 NLRB 400, 409 (1953). Employers may dispatch supervisors to engage in one-on-one discussions during work time with employees about the negative effects of union representation, *see, e.g., Lenkurt Elec. Co.,* 438 F.2d at 1107-08, and may disseminate written anti-union materials, *Beverly Enterprises-Hawaii, Inc.,* 326 NLRB 335, 336 (1998) (holding that "the [e]mployer did not engage in objectionable conduct when its supervisors handed out flyers [even] at a time when the [e]mployer was enforcing its otherwise valid no-distribution rule against employees").

A state law that both explicitly targets and directly regulates processes controlled by the NLRA is preempted under the *Machinists* doctrine. Because AB 1889, on its face, directly regulates the union organizing process itself and imposes substantial compliance costs and litigation risk on employers who participate in that process using the statutorily protected self-help mechanisms, it interferes with an area Congress intended to leave free of state regulation. The statute hands a coercive weapon to those seeking to unionize by creating an ever present threat of consuming and expensive litigation should an employer deign to offer its opinion on the merits of unionization. The statute ties the hands of management financially and allows pro-union groups free reign.[2]

Preemption will prevail over the application of local law even when federal law does not expressly protect the conduct at issue if "the application of state law . . . would operate to frustrate the purpose of the federal legislation." *Teamsters v. Morton,* 377 U.S. 252, 258, 260 (1964) (noting also that a conflicting state law cannot be permitted to "frustrate the congressional determination to leave th[e] weapon of self-help available, and to upset the balance of power between labor and management expressed in our national labor policy"). *Machinists* affirms this notion, holding that "a particular activity might be protected by federal law not only when it [is explicitly protected by the NLRA], but also when it was an

---

[2]I note an additional manner in which AB 1889 alters the balance as established between labor unions and employers: AB 1889 comes dangerously close to rendering employers' financial records an open book, which federal labor law does not allow. Labor unions are permitted to receive employers' financial records under the NLRA only after winning an election and only for legitimate collective bargaining purposes. *See NLRB v. Acme Industrial Co.*, 385 U.S. 432, 435-36 (1967). Under AB 1889, however, unions are able to bypass these federal limits and file lawsuits in state court, granting them access to employers' financial records in state court. With these records in hand, the unions would have additional leverage in advocating for a unionized workforce and place additional pressure on an employer to simply recognize a given union.

activity that Congress intended to be unrestricted by [a]ny governmental power to regulate." 427 U.S. at 141 (internal quotation marks omitted).

An overriding principle of the NLRA is that the collective bargaining process cannot function unless both employers and employees have the ability to engage in open and robust debate concerning unionization. *See NLRB v. Jones & Laughlin Steel Corp.*, 301 U.S. 1, 45 (1937) ("The theory of the Act is that free opportunity for negotiation . . . may bring about the adjustments and agreements which the Act in itself does not attempt to compel."). The NLRA's declared purpose is to "restor[e] equality of bargaining power" by, among other ways, "encouraging the practice and procedure of collective bargaining and by protecting the exercise by workers of full freedom of association, self-organization, and designation of representatives of their own choosing, for the purpose of negotiating the terms and conditions of their employment." 29 U.S.C. § 151.

By impeding the flow of information and any substantive discussion of unionization, the statute substantively regulates and disrupts "Congress' intentional balance between the uncontrolled power of management and labor to further their respective interests." *Boston Harbor,* 507 U.S. at 226 (internal quotation marks omitted). The statute frustrates "effective implementation of the [NLRA's] processes," rendering pre-emption of the California statute under *Machinists* appropriate. *Machinists,* 427 U.S. at 148 (internal quotation marks omitted).

That California purports to act through its spending power rather than its regulatory power, is a "distinction without a difference." *Wisconsin Dep't of Indus. v. Gould, Inc.,* 475 U.S. 282, 287 (1986). "[W]e cannot believe that Congress intended to allow States to interfere with the 'interrelated federal scheme of law, remedy, and administration,' under the NLRA as long as they did so through exercises of the spend-

ing power." *Id.* at 290 (quoting *Garmon,* 359 U.S. at 243) (citation omitted). Although a state's ability to control the use of its funds is an important state interest, regulation that specifically targets and substantially affects the NLRA bargaining process will be preempted, even if such regulation comes in the form of a restriction on the use of state funds. *See Metropolitan Milwaukee*, 431 F.3d 277, 278-79 (7th Cir. 2005).

## B.

The doctrine of *Garmon* preemption exists to uphold national labor policy and to vindicate Congress' decision to "entrust[ ] administration of the labor policy for the Nation to a centralized administrative agency, armed with its own procedures, and equipped with its specialized knowledge and cumulative experience." *San Diego Building Trades Council v. Garmon,* 359 U.S. 236, 242, 246 (1959). The California statute stifles employers' speech rights which are granted by federal law, and in doing so, impedes the ability of the NLRB to uphold its election speech rules and administer free and fair elections. I would hold that AB 1889 is also preempted under the *Garmon* doctrine.

In upholding the NLRA from state-law dilution, the Supreme Court has emphasized the importance of "delimiting areas of conduct which must be free from state regulation if national policy is to be left unhampered." *Garmon,* 359 U.S. at 246. *Garmon* preemption is focused on avoiding "the potential conflict of two law-enforcing authorities, with the disharmonies inherent in two systems, one federal the other state, of inconsistent standards of substantive law and differing remedial schemes." *Id.* at 242.

There are two distinct circumstances under which *Garmon* preemption can emerge. *Sears, Roebuck & Co. v. San Diego County Dist. Council of Carpenters,* 436 U.S. 180, 187 (1978). The first preempts activity which is *actually* protected or prohibited by federal law, dictating that "[w]hen it is clear

or may fairly be assumed that the activities which a State pur-ports to regulate are protected [by the NLRA], due regard for the federal enactment requires that state jurisdiction must yield." *Garmon,* 359 U.S. at 244. The second form of *Garmon* preemption deals with activities that are merely either *arguably* protected or *arguably* prohibited by the Act. *Sears,* 436 U.S. at 187-88. This second and distinct application of *Garmon* preemption holds that "[w]hen an activity is *arguably* subject [to the Act], the States as well as the federal courts must defer to the exclusive competence of the National Labor Relations Board if the danger of state interference with national policy is to be averted." *Garmon,* 359 U.S. at 245 (emphasis added).

The first branch of the *Garmon* preemption doctrine is at issue, and preempts AB 1889. Congress' intent, the Supreme Court and Ninth Circuit precedent all lead inextricably to the conclusion that Section 8(c) of the NLRA *actually* grants and protects speech rights of employers. *See supra* § I. Because the Act is a comprehensive regulatory scheme, to say that an activity is not punishable by the Act is the equivalent of pro-tecting that activity. AB 1889 encumbers these speech rights, and in doing so, interferes with the jurisdiction of the NLRB. Congress has directed the NLRB to oversee elections and determine what conduct constitutes an unfair labor practice under the Act. *See* 29 U.S.C. § 158(a)(1). Broadly speaking, and consistent with Section 8(c) of the NLRA, the NLRB takes a *laissez faire* approach to employee and employer speech, allowing passionate, partisan debate to proceed during a union organizing campaign. *See Trent Tube Co.,* 147 NLRB 538, 541 (1964). At the same time, the NLRB has jurisdiction to regulate a certain bandwidth of employer speech, to ensure compliance with Section 8(c). *See Midland Nat'l Life Ins. Co.,* 263 NLRB 127, 133 (1982) ("[W]e will no[t] probe into the truth or falsity of the parties' campaign statements, and [ ] will not set elections aside on the basis of misleading cam-paign statements. . . . [But] we will continue to protect against other campaign conduct, such as threats, promises, or the like,

which interferes with employee free choice."). For example, the NLRB has long enforced various "time, place, and manner" rules that bar certain types of campaign and speech activities in the vicinity of the polls or in the final hours before an election. *See Peerless Plywood Co.,* 107 NLRB at 429-30; *Milchem, Inc.,* 170 NLRB 362, 362-63 (1968). The NLRB has held that, consistent with Section 8(c), employers may hold mandatory meetings with employees about union organizing efforts, *Livingston Shirt Corp.,* 107 NLRB at 409, direct supervisors to informally discuss a representation campaign with employees, *see Stanley Oil Co.,* 213 NLRB 219, 225 (1974), and distribute anti-union literature to employees even when enforcing a no-solicitation rule to employees, *Beverly Enterprises-Hawaii,* 326 NLRB at 336.

The California statute regulates the same partisan employer speech that Congress committed to the jurisdiction of the NLRB. In doing so, AB 1889 discourages employer speech, which works at cross-purposes with the relaxed election speech rules established by the NLRB. Congress "entrusted [to the NLRB] . . . a wide degree of discretion in establishing the procedure and safeguards necessary to insure the fair and free choice of bargaining representatives by employees." *NLRB v. A.J. Tower Co.,* 329 U.S. 324, 330 (1946). By discouraging employer speech, California directly usurps the ability of the NLRB to administer elections that will foster fair and free employee choice.

Far from hewing to the NLRA's goal of installing a "national labor policy of minimizing industrial strife," *Emporium Capwell Co. v. W. Addition Cmty. Org.,* 420 U.S. 50, 62 (1975), AB 1889 encourages additional litigation by allowing unions and the California Attorney General to bring proceedings in state court to attack the very partisan employer speech that the NLRB protects. California defies Congress' decision to "entrust[ ] to the Board alone" the criteria necessary to conduct a fair representation election. *NLRB v. Waterman S.S. Corp.,* 309 U.S. 206, 226 (1940).

"*Garmon* preemption is 'intended to preclude state interference with the National Labor Relations Board's interpretation and active enforcement of the integrated scheme of regulation established by the NLRA.' " *Alameda Newspapers,* 95 F.3d at 1412 (quoting *Golden State Transit Corp. v. City of Los Angeles,* 475 U.S. 608, 613 (1986)); *see also Gould,* 475 U.S. at 286-89. California's displacement of the NLRA's free speech protections and its interference with the NLRB render AB 1889 preempted under *Garmon. Garmon* preemption applies because AB 1889 "regulate[s] conduct so plainly within the central aim of federal regulation [that it] involves too great a danger of conflict between power asserted by Congress and requirements imposed by state law," thus creating a "potential frustration of national purposes." *Garmon,* 359 U.S. at 244.

The opinion of the court avoids general *Garmon* preemption principles and replaces them with an overly narrow view of the *Garmon* doctrine that is inapplicable to this dispute. The critical error of the opinion of the court lies in a misreading of *Sears, Roebuck & Company,* 436 U.S. 180, and a misunderstanding of the form of *Garmon* preemption that applies to AB 1889.

The opinion of the court relies upon *Sears* for the proposition that *Garmon* preemption applies only when the controversy presented to the state court is identical to the controversy that would be presented to the NLRB. The opinion of the court fails to recognize, however, that this requirement of identicalness applies only to the type of *Garmon* preemption applied to those activities that are merely *arguably prohibited* by the Act. Because of heightened concerns rooted in the Supremacy Clause of the United States Constitution, the requirement of identicalness does not apply if the activity is either *arguably protected* or, as here, *actually* protected, by the Act. An analysis of *Sears* readily uncovers the misconception of the *Garmon* doctrine as expressed in the court's opinion filed today.

At issue in *Sears* was the power of a state court to hear a trespass lawsuit brought by an employer to enforce trespassing laws against union picketing. *Sears,* 436 U.S. at 182. The Court first considered whether the picketing was *"arguably prohibited"* by federal law, which would be possible grounds for preemption. *Id.* at 190-98 (emphasis added). The Court concluded that, with regard to activity which is arguably prohibited by the Act, *Garmon* preemption (and the accompanying risk of interference with the jurisdiction of the NLRB) emerges only when "the controversy is identical to . . . that which could have been, but was not, presented to the Labor Board." *Id.* at 197. The Court concluded that the NLRB's inquiry regarding the arguably prohibited conduct would prove to be vastly different than an inquiry by the state court as to whether there was a trespass, and therefore, declined to find *Garmon* preemption.

The Court then turned to the question whether the *arguably protected* character of the union's picketing could lead to *Garmon* preemption. *Id.* at 199-207. Preliminarily, the Court noted that "state-court interference with conduct actually protected by the act" invokes a "constitutional objection" rooted in the Supremacy Clause. *Id.* at 199. Therefore, "[c]onsiderations of federal supremacy . . . are implicated to a greater extent when labor-related activity is protected than when it is prohibited." *Id.* at 200. The Court concluded that even though the Union's peaceful, if trespassory, picketing could arguably be protected under the Act, such a trespass "is far more likely to be unprotected than protected." *Sears,* 436 U.S. at 205. Therefore, the Court held, "the assertion of state jurisdiction [to adjudicate the alleged trespass] does not create a significant risk of prohibition of protected conduct." *Sears,* 436 U.S. at 207. Notably, with regard to the *arguably protected* conduct of the picketing and trespass, the Court did *not* require (as it did with respect to *arguably prohibited* conduct) that the controversies before the NLRB and state court be identical before invoking *Garmon* preemption.

As this analysis of *Sears* indicates, the rule that *Garmon* preemption applies only when the state court and NLRB inquiries are identical only applies to activity which is *arguably prohibited* under the Act. With regard to conduct that is *arguably protected* under the Act, the standard under which preemption is found becomes less stringent because of heightened federal supremacy concerns. Accordingly, as compared to activity which is merely arguably prohibited by the Act, *Garmon* preemption is more readily found in relation to activity which is *arguably protected* or *actually protected* by the Act. 436 U.S. at 199-200.

At issue with regard to AB 1889 is not a mere arguable prohibition or arguable protection granted by the NLRA. Rather, Section 8(c) of the NLRA constitutes an *explicit, actual* protection which explicitly protects the speech rights of employers.

All along, the *Sears* Court explicitly disclosed that it was *not* addressing a case that involved *actually protected* conduct. *Sears,* 436 U.S. at 187 ("The case is not, however, one in which 'it is clear or may fairly be assumed' that the subject matter which the state court sought to regulate . . . is either prohibited or protected by the Federal Act."). In light of the explicit speech protections granted by Section 8(c) of the NLRA, the *Sears* test of strict identicalness does not apply to a *Garmon* preemption analysis of AB 1889. Simply put, the opinion of the court's reliance on *Sears,* and its application of the test of identicalness between the NLRB's inquiry and the state court's inquiry, is misplaced.

The traditional *Garmon* analysis applies to the explicitly protected free speech rights of employers, and because AB 1889 interferes with those rights and undermines the speech rules and election procedures of the NLRB, I would hold that AB 1889 is preempted under *Garmon.*

IV

I must respectfully dissent because AB 1889 violates the
First Amendment and is preempted under both *Machinists* and
*Garmon*. The District Court properly entered summary judg-
ment in favor of plaintiffs.